Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. Mr. Scherer. Good morning and may it please the Court. I'm Gene Scherer, representing the plaintiffs in this separation of power suit against the Metropolitan Washington Airports Authority, or MWA for short. Like virtually all separation of powers or non-delegation cases, this case is about accountability for the exercise of governmental power, what Madison called in Federalist 51, the need for the government to have, quote, a dependence on the people. But here the issues arise in the unusual context of an entity that exercises power under both state and federal law. And so before I address our legal points, I have an exhibit that captures the interaction between the federal and state authority in this case. And it also shows the importance of accountability and the exercise of the federal power that's being exercised here. If you look at this exhibit, the map on the right shows portions of the And then the map on the left shows the Dulles Airport proper, which is the area that's grayed out there. The map also shows portions of the Metro Silver Line, which as you can see sits on both federal property and property that's owned by MWA. Now these maps not only illustrate MWA's violation of the capital cost requirement of the Federal Transfer Act, they also show where MWA has spent the approximately $3 billion in inflated fees that it has imposed and is now imposing on hundreds of thousands of people using federally owned facilities. Your argument is that it must be a federal agency? No, that's one of our two independent arguments, Your Honor, that is one of our arguments. The argument that I'd like to focus on, however, today is a different argument that was not addressed by the district court at all, and that is that even if an entity is not a federal instrumentality, if it exercises federal power, it's still subject to the requirements of the Constitution in Article I or Article II, it's still subject to separation of powers requirements. First of all, with respect to the federal entity, isn't the LeBron test that it must be federally created and controlled? That is part of the, those are two of the elements of the LeBron test, that's right, and Why would it be a federal entity if the legislative bodies of Virginia and the District of Columbia created it? Well, it was created in part by the federal government. The MWA was essentially an empty shell until the Transfer Act was passed and gave MWA the authority to But the Board of Review that established federal control has been invalidated? That's correct. Well, but that wasn't the only mechanism of federal control. That was With an interstate compact, which when more and more matters are of regional interest, this gives the states a measure of participation and control over something that's of regional interest and don't make a federal entity out of everything without creating a vast extension of federal power at the expense of the states and their ability to direct matters of regional interest. I mean, interstate compacts are a very creative response to the fact that more and more problems are regional in nature. Sure, Your Honor, and we're not disputing that MWA is a valid federal compact. What we're disputing is the exercise of federal authority, federal power, without the accountability that Articles 1 and Article 2 require. One of the things I'm having trouble understanding about your argument is, what is your sense of the test for what constitutes sufficient federal power to subject an independent entity to separation of powers analysis? Not all exercises of federal government power trigger constitutional scrutiny. So how do you want us to draw that line? Your Honor, I think that question was answered in Judge Niemeyer's opinion in the Pittston case where he says there, for a unanimous court, that the test is whether the entity is, quote, exercising power over others. And there's no question that MWA does that when it sets fees and tolls that motorists must pay to use the parking lots at Dulles Airport. Exercise of power over others? Well, that's what the phrase that Pittston used was, exercising government power over others. Does that mean? Yeah, I don't quite understand it either. Certainly, what was at issue there in Pittston was a, or the argument that was made in Pittston was that this private entity, a trust that had been set up. Listen, if you're going to try to press an impermissible federal delegation argument, you have to have some kind of federal power, legitimate federal power, that's being impermissibly delegated. But how is this a core federal power? I mean, I don't understand how the operation of a commercial airport is a core federal power because, as I understand it, Dulles and Reagan are among the very few airports in this country that are actually federally owned. And most airports, most airport authorities, you have a web of state, municipal, and private involvement. But the federal government doesn't own or operate most commercial airports in this country. So how can there be an impermissible delegation of a core federal power when most airports in the country, most commercial airports in the country, are neither owned nor operated by the federal government? Your Honor, I would have to take issue with the assumption in your question that it's only a federal power, it's only the exercise of a federal power, if it's some kind of a federal power or inherently federal power. If you look at the case law on this point, Pittston... Perhaps, if it could be phrased this way, what in your view is the federal power that MWAA exercises? Well, the federal power is the power, as Your Honor's opinion in court mentioned, the Transfer of Fees and Charges. And when an entity is levying fees and charges for the use of a federal facility, we think that constitutes the exercise of federal power. And that's consistent with Pittston and Carter-Cole and that whole line of decisions. And especially in circumstances like this case where you also have an ongoing federal involvement in the exercise of that power, it's not sufficient to satisfy separation of powers, but there is an ongoing federal involvement and oversight over some aspects of what the agency is doing. And you also have an agency here that is using that power over tolls and fees to take money from some groups of citizens and essentially transfer it to other groups of citizens. So certainly... So levying fees for use are an exercise of federal power? Certainly when combined with the other two elements that I mentioned, namely an ongoing federal supervision over some aspects of that activity and the ability to essentially cross subsidize some groups of citizens at the expense of others. When you have those three things together... It seems to me that that's a very open-ended conception because you don't get an impermissible delegation of federal power when the federal government enters into a lease with a private party or a state. And you don't get some sort of impermissible delegation of federal power when the federal government contracts with a military contractor or any of the innumerable entities with whom the federal government contracts. And you don't get an impermissible delegation of federal power when the federal government maybe gives funds to, let's say, state educational systems. And along with the funds are conditions that are attached to the expenditure and use of those funds. I've never thought that any of this raised a question of an impermissible delegation of federal power or that we would tend to regard that contracting, leasing, regulating as creating a federal entity. I mean, the implications of what you're suggesting seem to me quite staggering. Well, let me try to be more clear. We're not advancing an approach that would be anywhere near that broad, Your Honor. What we are saying and what we think the case law supports is that when an entity, whether it's a private entity or an entity of another government, sets the prices for the use of a federal facility. So we're not talking about concessionaires selling hamburgers in a national forest or something like that. They aren't setting prices for the use of a federal facility. But when you have an entity that's setting prices for the use of a Do you mean that the Transfer Act is unconstitutional? The Transfer Act is unconstitutional only insofar as that it did not provide a sufficient mechanism for controlling MWA's use of that power to set prices for the use of federal facilities. It's not unconstitutional on its face, but as applied, it's unconstitutional to that extent. What's unconstitutional about Congress delegating to the Secretary of Transportation or to a federal agency the power to enter into a lease? Nothing. And if Congress Well, that's what happened here. Well, if Congress had also given the Secretary the authority either to set the prices for the use of the toll road and parking facilities and that sort of thing, or probably even if Congress had given the Secretary the authority to review and veto prices set by MWA, then we wouldn't have a non-delegation problem. But Congress didn't do that in the Transfer Act. It granted MWA essentially unlimited The problem that was identified by the court in LeBron, your argument, the problem, one of the difficulties I'm having with your argument is that it seems at war with itself somewhat internally. You want to say that no one has full control over the board, and yet you simultaneously want to assert that the federal government has control every, I think you put it every step of the way. No, the federal government I think you could actually use both of those phrases. It's clear the federal government does have a lot of control over what MWA does. What it does not have, and the nub of the federal power problem, is that the federal government does not have authority over the prices that MWA sets for the use of public facilities. That's the problem. I'm having a hard time understanding where all of this is going. Because when I read the arrangements here, which were simply that the Transfer Act had delegated to the Secretary of Transportation the authority to lease Dulles to MWA. That seemed to be perfectly ordinary, and probably something that happens many times throughout the federal government. And to invalidate this kind of arrangement, I just don't know where it all leads. But why don't you think about that for your rebuttal? Okay. We're not asking for the court to invalidate the arrangement, but merely to say that something in addition needs to be provided to cure this delegation problem. Thank you, Your Honor. When you come back, if you would tell us specifically what that something is, it would help me. Okay. May it please the Court, Stuart Raphael for MWA. The District Court correctly held that MWA is an interstate compact entity, not a federal instrumentality, and that the Dulles Metro Rail Project does not violate the provision of the Transfer Act that requires airport revenues to be spent on airport costs. MWA is plainly not a federal instrumentality. As the Court already has pointed out, under LeBron and Meridian, which we think are the two cases that control here, the two most important factors in the test are whether the entity is both created by the federal government and controlled by the federal government. And in this case, neither of those prongs is satisfied. With regard to federal creation, the District of Columbia and Virginia created MWA by interstate compact in 1985. It's true that the operation wouldn't have succeeded unless the government also transferred through the lease control of the airports. But the entity was created by interstate compact, not by the federal government. And that is seen in the Transfer Act in various provisions, 49102A, 49103, 49106A. All of those talk about MWA having the powers conferred on it by Virginia and the district. With regard to my friend's point about fees and charges being authorized in the Transfer Act, the power to impose fees and charges is under the compact. It's in Virginia Code Section 5.1-156A-8. And that power preexisted the Transfer Act. So that's not a federal power conveyed by Congress. I don't understand where the appellant's argument is leading. I don't understand what they say, basically. It's sort of a moving target for me. I don't understand what they say the federal government exactly can do and what it can't do. What's impermissible about this? Is it the delegation? Is it the terms of the lease? What's impermissible about it? You know, I just don't understand where it goes or what the criteria are. It seems fuzzy. Judge Wilkinson, you're exactly right. There is no limiting principle. I think when you read their brief, what they focus on is the idea that there's a federal interest here. But every interstate compact necessarily involves a federal interest. That's why congressional consent is required. And we made the point in our brief that if you accept their proposition, you wouldn't Federal interest every time the federal government contracts? Every time the federal government leases? Every time the federal government appropriates funds to a state or local entity? That's exactly right. And as this court pointed out in Meridian, when Congress created Freddie Mac, there was certainly a public, undeniably I think was the word this court used, undeniably a governmental interest there. But the court said Freddie Mac's not controlled by the federal government, so it doesn't satisfy the LeBron test. And the same is true here. Only three of the 17 board members of the board of directors are appointed by the president. The others are appointed by Virginia, Maryland, and the district. And sort of the proof's in the pudding. The whole premise of the plaintiff's claim, I think this goes to Judge Duncan's point, that their argument is at war with itself. The premise of their claim is that there isn't adequate federal control. But that proves that it's not a federal instrumentality. That's really the problem with their argument. Let me turn to the second main claim, the one they opened with, which is this question of whether there's a violation of the Transfer Act because as they say, airport revenues are not being spent on airport costs. The claim fails for two reasons. First, the Dulles Metro Rail project has always been part of the conception for Dulles Airport and part of the FAA Federal Aviation Administration master plan for the airport. And EMWA spending money for that project is plainly an airport cost. And second- Doesn't the master plan itself expressly contemplate metro rail expansion? It does. That's exactly right. And the second- It says that in the master plan, which predated the lease, didn't it? It predated the lease. It predated the formation of EMWA. It's always been part of the plan. And the other problem with the argument is they've waived it because they elected not to pursue the lease claim, which is count eight. They've only argued the Transfer Act claim, which is count seven. The difficulty with the statutory argument is that you've got the Transfer Act, which permits the Secretary of Transportation to lease Dulles and Reagan to EMWA. So obviously in Congress's eyes, the Secretary of Transportation, under the Transfer Act, is the critical federal official here. Yes. And consistently, the Secretary of Transportation's view of this is that using these revenues for access purposes and for metro rail access and for parking purposes and everything is a permissible use. That's exactly right. Because the whole key to all this is, does it serve the purposes of the airport? That's the keystone concept. Yes. And, you know, I'm not sure that that's our judgment in the first instance. I think it's the Secretary of Transportation has been vested with that kind of judgment. And the Secretary of Transportation has never wavered from the position that the use of this dedicated fund for access and parking serves airport purposes. That's exactly right. It's in the 2008 certificate that the Secretary issued, which is at page 414 of the Joint Appendix, making exactly those findings. And they have this chart up here showing a couple stations that are not on airport land. But if you read that estoppel certificate, the Secretary understood that some of these stations were not on airport land and said that it was still a valid airport purpose and that there was no violation of the lease. So the one argument, there were lots of arguments that they made in the district court on this. The one that they, I'm sorry, Your Honor. The appellants here seem to conceive for purposes of the lease and the statutory argument is that an airport is only a terminal in the runways. But that's not the only view you can take of an airport. You can take the Secretary of Transportation's view that an airport is an entire infrastructure and that for the airport to operate and serve its purposes, there needs to be adequate parking and there needs to be adequate access so people don't have to devote an entire day making a flight and getting to the airport. That's exactly right. And to your point, Judge Wilkinson, the Transfer Act itself defines the airport to include the entire Dulles corridor or right-of-way that's owned by the federal government. That's part of the airport. So it is not a cause for concern with respect to your argument that such a small percentage of the ridership is likely to utilize the corridor to actually reach the airport proper? No, and for two reasons. Number one, the section that they're suing under here is 49-104-A3 that says revenues have to be spent on airport costs. There is no requirement in that section that money be spent on airport land. They're reading in that provision. The other point is you raise an interesting question going to the equity issue. Is MWOT paying too much for this because at some of these stations only 12% of the riders are actually going to the airport? And I think, Your Honor, that is answered by the cost sharing that was agreed to by the funding partners at the outset. If you look at page 37 of the joint appendix, this is from the complaint, has a chart that lists who's paying what for this project. MWOT share is 4.1% spent from its aviation funds. The federal government in Virginia pay a very large chunk, about 25%. Loudoun County and Fairfax County pay about 20%. What was the site? Page 37 of the joint appendix. And so on this question of is MWOT paying too much, no, these costs are being shared by everybody who benefits from this project. So MWOT is spending 4.1% from its aviation funds. And then it's true, you have this larger funding source, the Dulles Toll Road revenues, which Virginia, those were Virginia's monies because it's leasing, it was leasing the land from the federal government. And this project came to fruition because Virginia agreed to give MWOT a permit to use that funding source to be able to build Metrorail. And that is, and as this court found in core, this is a single integrated facility. Building the Metrorail project will improve conditions for riders on the Dulles Toll Road because it will reduce traffic and give them an alternative mechanism to go through the Dulles Corridor. And that's why. Interesting questions. But, you know, what the impact of this is and what the impact of that is. The basic question is what in the law would invalidate this relationship? That's the question I'm having trouble with. The other questions are for planning commissions and whatever. Business judgment. But what, you know, given the Secretary's, given the Secretary's view and given the fact that it's a very rational conception of what an airport is or what it's meant to be, that's the question of law. And that's my problem with the appellant's views. I don't see the legal foundation. You know, whether these are wide as expenditures or whether they're not, I don't, you know, I don't know that. There are people that have a far greater expertise in that kind of thing than I do. But at any rate. You're agreeing that those are legally insignificant, whether other people benefit. Yes, that's correct. So the equity argument doesn't really move the inquiry, does it? It doesn't. Because ultimately you're talking about the business judgment of EMWA, the federal government and Virginia as to how they allocated the costs or paying for the project. But the legal claim here is that airport revenues are not being spent at airport costs. And it's plainly an airport cost for EMWA to spend money to get Metro Rail to Dulles because that's how people can get to and from the airport. And then the last answer, Judge Wilkinson, if I may finish my answer. Quickly. Yes, Your Honor. They have dropped the lease claim, right? They tried to drop the federal defendants as parties to this case. They did not appeal count eight. And the only remedy under the Transfer Act is to enforce the lease, a claim that they've dropped. So it's procedurally defective as well. We've picked that up from your brief. Yes, thank you, Your Honor. Mr. Yellen, let's hear from you, sir. Thank you, Your Honor. May it please the Court. Louis Yellen from the U.S. Department of Justice. I'm here today on behalf of the federal defendants. I'd like to make one point that I hope will aid the Court's analysis and then respond to any questions. Bring the microphone. Yes, Your Honor. I'm sorry. I'm pretty sure I hear everything you said. Thank you, Your Honor. I'd like to make one point that I hope will aid the Court's analysis and then respond to any questions that the Court might have. Judge Duncan, you observed that plaintiffs' arguments appeared to be at war with themselves. And Judge Wilkinson, you observed that the arguments appeared to be a moving target. I think both those observations are exactly right. As for the constitutional arguments, there are two distinct doctrines that plaintiffs conflate. One is the non-delegation doctrine, the central question of which is whether Congress has delegated an essential federal governmental function to any party improperly, whether a private party, as in the Carter-Cole case, or a federal party, as in cases involving improper delegations to the executive branch. The second inquiry is whether or not the entity at issue is a federal entity. If it is a federal entity, it doesn't matter whether it operates an ice cream shop or a core governmental function. If it is a federal entity, it must be constituted in accordance with Articles 1 and 2 of the Constitution. There are distinct tests for those two doctrines. The federal entity doctrine is governed by LeBron in this Court's decision in Meridian, and plaintiffs' arguments move between the two to try and buttress support for their various contentions. We think that conflation confuses the analysis, and we think that focusing on the essential federal governmental function for the non-delegation question and focusing on the LeBron and the LeBron factors for the federal entity analysis will assist the Court's analysis. With that, I'd be pleased to answer any questions the Court might have for the federal government. Alison, do you have any questions? Thank you. We have no questions. Thank you, Your Honours. Well, thank you. Let me just address a few points here. First of all, Judge Duncan, to answer your question about what is that something more that's needed here. Ultimately, that would be up to Congress, but there are two options. As in, you know, as in Pitston and Carter-Cole and those cases,  to decide whether or not to make a decision for Congress itself to set the rates. That's probably not very realistic. So Congress could specify that... Specifically, what relief do you seek? Well, we're seeking a reversal of the grant of dismissal, and what kind of relief are we seeking ultimately in the case? Well, I think ultimately we would want a declaration from the district court that as presently constituted, there's not sufficient federal control, federal governmental control over the rates that M.W.A. charges for tolls and parking fees and that sort of thing. What is this? What's sufficiency and everything? If I were a district judge and we remanded under those terms, I would know what I was supposed to do. Well, first of all, the district court has to determine whether there's a violation of separation of powers or non-delegation. That was exactly what I was trying to get you to tell me. What relief would you have us grant? What specifically... Reverse the... And do what? Say what? Well, and to say that we have adequately pleaded a claim for violation of separation of powers and or non-delegation principles. And... We pleaded five claims. I mean, which one are we talking about? And your response to what you wanted the district court to do was to force some sort of quantification of the sufficiency of the tolls and fees, as I understood your previous answer. So I'm still... No, as to, you know, as to our separation of power counts, you know, we have some claims that we've abandoned, but as to the separation of powers counts, not count eight, by the way, contrary to what Mr. Raphael says, but as to the separation of powers counts, we simply want a declaration from the district court that has presently constituted the arrangement between the federal government and MWA is insufficient because there are insufficient federal controls over the prices that MWA charges. I don't understand which claims are still preserved and which are abandoned, but leaving that to one side, there's an old... There's an old maxim in judging, and the maxim is, do no harm. And if we... Just do no harm. Sometimes that's the best approach. And, you know, quite frankly, sir, if we adopted your argument, whatever it is, and remanded under whatever terms you want, it would be vague. And you know what? We'd create a pluperfect mess. We'd be really good, because then the question would be asked, well, what is sufficient? What is the proper lease? What is the proper characterization of the entity? There would be a thousand subsidiary questions, and we would have created, as a practical matter, a perfect mess. Well, with all respect, Your Honor, I don't think that's true. I think if the court simply said, look, plaintiffs have adequately pleaded a claim for violation of separation of powers and non-delegation principles... Because. Because the... Well, that's right. And the reason is that, as presently constituted, the arrangement between the federal government and MWA does not provide the federal government with sufficient control. There's another maximum, at least for my purposes. If I don't know what you're asking for, I can't give it to you. Is it clear to me what, at the end of the day, would make you happy? What is it you want an opinion to say? What sort of guidance are we to give to the district court on this remand? Okay. Well, all we want for today is reversal of the dismissal. There has to be a reason for that. Right. You can't just say, we don't like it. Presumably, the opinion has to say something. It has to explain. And here's what I would have you say with respect to our separation of power, with respect to our non-delegation argument. Forget for a moment the federal instrumentality point. With respect to our non-delegation argument, here's what I would want you to say. That... Articles 1 and Article 2 and the separation of powers principles embodied in those require that when Congress gives an entity authority to set rates and charges for federal facilities, it has to provide federal control. And that would be, in this case, that would be allowing the secretary to either set those rates himself or to veto them when they're set by EMWA. You can't do that completely out of the state's hands. Well, that's essentially what the Supreme Court... We essentially authorize a vast expansion of federal power, which the federal government really probably doesn't even want. We take it out of the state's hands, which have been traditionally doing this and presumably over the years have acquired a degree of expertise. And we hold something to be an impermissible delegation, which an impermissible delegation is something that's very infrequently found, and you have to delegate a core federal function. And it's interesting to me to see how running a commercial airport inherently qualifies as a core federal function. With respect, Your Honor, the case law doesn't say that it has to be a core federal function in order for it to be federal power. Yes, Pittston says... The distinction Pittston draws is between ministerial acts, like collecting tolls that have been at rates that have been set by Congress. Pittston says that's okay, that's not the exercise of federal power, but it doesn't say that to be an exercise of federal power it has to be something that's inherent in federal governance or something like that. I mean, government today is more complex than it was at one point, but there are all sorts of cooperative arrangements between the federal government and the states. You just take the field of environmental law. It is just covered with cooperative arrangements between the federal government and the state. Education law is to... Government these days is a cooperative... It's a cooperative venture. And what you want us to do is unthread all of that and make everything and build walls of separation and cut short in field after field after field the kind of cooperative ventures that states among themselves and states and the federal government have undertaken. And that, you know, that's... Among many other things, it's a very regressive notion. And, you know, I just... I don't see it. Now you can tell me how ill-informed or... Could I? Could I? ...how off-base I am. I'll give you the last word, but I want you to know the extent of my reservation. Well, thank you, Your Honor. With all respect, that's not what we're asking the court to do. I would hope that as the court reconsiders the briefing and the argument in the case, though, that you would be careful to enforce the provisions and the principles that the framers put in the Constitution to ensure adequate accountability for the exercise of federal power. Thank you. Thank you, sir. We'll come down and greet counsel and move into our next case.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Barbara Milano Keenan